1   AMY J. LONGO, Cal. Bar. No. 198304
    Email:  LongoA@sec.gov
2   William S. Fiske Cal. Bar No 123071
    Email:  FiskeW@sec.gov
3
    Attorneys for Plaintiff
4   Securities and Exchange Commission
    Michele Wein Layne, Regional Director
5   John W. Berry, Associate Regional Director
    Victoria A. Levin, Assistant Regional Director
6   444 S. Flower Street, Suite 900
    Los Angeles, California 90071
7   Telephone: (323) 965-3998
    Facsimile: (213) 443-1904
8
9                  UNITED STATES DISTRICT COURT

10                 CENTRAL DISTRICT OF CALIFORNIA

11                      WESTERN DIVISION

12
    SECURITIES AND EXCHANGE              Case No.  2:19-CV-01412-FMO
13  COMMISSION,
                                         **MEMORANDUM OF POINTS**
14              Plaintiff,               **AND AUTHORITIES IN**
                                         **SUPPORT OF PLAINTIFF**
15         vs.                           **SECURITIES AND**
                                         **EXCHANGE**
16  DANIEL R. ADAMS, MICHAEL A.          **COMMISSION'S MOTION**
    FLANDERS, SPIDERWORX MEDIA           **FOR DEFAULT JUDGMENT**
17  LLC, and AN L.A. MINUTE LLC,         **AGAINST DEFENDANTS**
                                         **SPIDERWORX MEDIA LLC,**
18              Defendants.              **AND AN L.A. MINUTE LLC**

19                                       Date:    June 27, 2019
                                         Time:    10:00 A.M.
20                                       Ctrm:    6D
                                         Judge:  Hon. Fernando M. Olguin
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................1

II.    STATEMENT OF FACTS ...................................................................2

    A.     Adams and Flanders Co-Found Spiderworx and ALAM ..................2

    B.     Defendants' Two Securities Offerings.................................................3

        1.     The Spiderworx loan agreements ..............................................3

        2.     The ALAM membership interests .............................................4

    C.     Defendants' Material Misrepresentations and Omissions ..................4

III.   ARGUMENT ......................................................................................8

    A.     The SEC Has Complied With Fed. R. Civ. P. 55(a) and L.R. 55-1.....9

    B.     The *Eitel* Factors Support Entry of Default Judgment.....................10

        1.     Possibility of prejudice to the SEC ..........................................10

        2.     Substantive merits and sufficiency of the complaint...............11

        3.     Amount at stake and seriousness of Spiderworx's and ALAM's conduct ....................................................................................15

        4.     Possibility of disputed facts ....................................................15

        5.     Possibility of excusable neglect ...............................................16

        6.     Policy for deciding on the merits .............................................17

    C.     The SEC Is Entitled to the Relief it Seeks ......................................17

        1.     Spiderworx and ALAM should be permanently enjoined.......17

        2.     Spiderworx and ALAM should pay third-tier civil penalties ..19

    D.     Default Judgment Against Spiderworx and ALAM Should be Entered Without Delay ........................................................................21

IV.    CONCLUSION..................................................................................22

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aaron v. SEC,*
  446 U.S. 680, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980) ................................14

*Adams v. Agrusa,*
  No. 2:15-cv-07270 SVW-RAO, 2016 WL 7665767, at *2 (C.D. Cal.
  July 20, 2016) ................................................................................................9

*Aldabe v. Aldabe,*
  616 F.2d 1089 (9th Cir. 1980) ........................................................................8

*Benny v. Pipes,*
  799 F.2d 489 (9th Cir. 1986) ..............................................................8, 9, 11

*Constr. Laborers Trust Funds for S. Cal. Admin. Co. v. Black Diamond Contr.
Grp., Inc.,*
  No. SACV 17-770-JLS, 2017 WL 6496434 (C.D. Cal. Dec. 18, 2017) ..........22

*Eitel v. McCool*
  782 F. 2d. 1470 (9th Cir. 1986) ......................................................................8

*First T.D. & Investment, Inc.,*
  253 F.3d 520 (9th Cir. 2001) ........................................................................21

*Frow v. De La Vega,*
  82 U.S. 552 (1872) ........................................................................................21

*Glickenhaus & Co. v. Household Int'l, Inc.,*
  787 F.3d 408 (7th Cir. 2015) ........................................................................12

*Janus Capital Group, Inc. v. First Derivative Traders,*
  131 S. Ct. 2296 (2011) ..................................................................................12

*Kloepping v. Fireman's Fund,*
  1996 U.S. Dist. LEXIS 1786 (N.D. Cal. Feb. 14, 1996) ..................................8

*Landstar Ranger, Inc. v. Parth Enterprises, Inc.,*
  725 F. Supp. 2d 916 (C.D. Cal. 2010) ..........................................................10

*Lopes v. Vieira,*
  543 F. Supp. 2d 1149 (E.D. Cal. 2008) ........................................................11

*Lorenzo v. SEC,*
  139 S.Ct. 1094 (2019) ..................................................................................12

*Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit,*
  547 U.S. 71 (2006) ........................................................................................14

*Mullane v. Central Hanover Trust Co.,*
  339 U.S. 306 (1950) ......................................................................................16

*Penpower Technology Ltd. v. S.P.C. Technology,*
  627 F. Supp. 2d 108 (C.D. Cal. 2008) ..........................................................10

*PepsiCo Inc. v. Triunfo-Mex. Inc.*,
    189 F.R.D. 431 (C.D. Cal. 1999)...................................................................8, 9

*PepsiCo, Inc. v. Cal. Sec. Cans*,
    238 F. Supp. 2d 1172 (C.D. Cal. 2002)..............................9, 11, 15, 17

*Phillip Morris USA, Inc. v. Castworld Prods., Inc.*,
    219 F.R.D. 494 (C.D. Cal. 2003).......................................................16

*Sec v Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) ..........................................................12

*SEC v. Abacus Int'l Holding Corp.*,
    2001 U.S. Dist. LEXIS 12635 (N.D. Cal. Aug. 16, 2001) ...............19

*SEC v. Baccam*,
    No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168, at *7 (C.D. Cal.
    June 14, 2017)...............................................................16, 19, 21

*SEC v. Benger*,
    931 F. Supp. 2d 904 (N.D. Ill. 2013).................................................13

*SEC v. Fehn*,
    97 F.3d 1276 (9th Cir. 1996) ..........................................................12

*SEC v. Hughes Capital Corp.*,
    124 F.3d 449 (3d Cir.1997) ............................................................14

*SEC v. Koracorp Industries, Inc.*,
    575 F.2d 692 (9th Cir. 1978) ..........................................................18

*SEC v. Lion Capital Mgmt., LLC*,
    No. C 12-05116 WHA, 2013 U.S. Dist. LEXIS 157133, *7 (N.D. Cal.
    Nov. 1, 2013) ..................................................................................11

*SEC v. Manor Nursing Centers, Inc.*,
    458 F.2d 1082 (2d Cir. 1972) .........................................................15

*SEC v. Mercury Interactive, LLC*,
    No. 5:07-CV-02822-WHA, 2011 WL 5871020 (N.D. Cal. Nov. 22,
    2011) 13

*SEC v. mUrgent Corp.*,
    Fed. Sec. L. Rep. P 96, 746, 2012 WL 630219, at **2-3 (C.D. Cal. Feb.
    28, 2012).........................................................................................20

*SEC v. Newman*,
    CV 12-03142-BRO (PLAx), 2016 193639 (C.D. Cal. July 15, 2016).............11

*SEC v. Pedras*,
    No. CV 13–7932 GAF (MRWx), 2014 WL 12597332, at *4 (C.D. Cal.
    Apr. 16, 2014).................................................................................11

*SEC v. Phan*,
    500 F.3d 895 (9th Cir. 2007) ..........................................................11

*SEC v. Platforms Wireless Int'l Corp.*,
  559 F. Supp. 2d 1091 (S.D. Cal. 2008) ............................................14

*SEC v. R.G. Reynolds Enters.*,
  952 F.2d 1125 (9th Cir. 1991) .......................................................13

*SEC v. Rubera*,
  350 F.3d 1084 (9th Cir. 2003) .......................................................13

*SEC v. Sells*,
  No. C 11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012) ...............13

*SEC v. Souza*,
  2011 WL 2181365, at *3 (E.D. Cal. June 3, 2011) ............................21

*SEC v. W. J. Howey Co.*,
  328 U.S. 293 (1946) ....................................................................13

*SEC v. Wallace*, Case
  No. SACV 16-01788 AG, 2017 WL 8230026 (C. D. Cal. May 8, 2017).........10

*SEC v. Zandford*,
  535 U.S. 813 (2002) ....................................................................14

*Shanghai Automation Instrument Co. v. Kuei*,
  194 F. Supp. 2d 995, 1008-09 (N.D. Cal 2001) .............................22

*Superintendent of Ins. v. Bankers Life & Casualty Co.*,
  404 U.S. 6 (1971) .......................................................................14

*TeleVideo Sys., Inc. v. Heidenthal*
  826 F. 2d 915 (9th Cir. 1987) .........................................................9

*TeleVideo Sys., Inc. v. Heidenthal*,
  826 F. 2d 915 (9th Cir. 1987) .....................................................9, 16

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ....................................................................12

*United States v. Nader*,
  542 F.3d 713 (9th Cir. 2008) .......................................................11

*United States v. Naftalin*,
  441 U.S. 768 (1979) ....................................................................14

*United States v. Odessa Union Warehouse Coop.*,
  833 F.2d 172 (9th Cir. 1987) .......................................................18

*Utah Lighthouse Ministry v. Foundation for Apologetic Info. & Research*,
  527 F.3d 1045 (10th Cir. 2008) ....................................................11

**Securities Act of 1933**

Section 17 (a)(2)
  [15 U.S.C. § 77q(a)(2)]...................................................2, 11

iv

Section 20(b)
  [15 U.S.C. § 77t(b)] ...................................................................................18

Section 20(d)
  [15 U.S.C. § 77q(a)] ............................................................................17, 19

Section 20(d)(1)
  [15 U.S.C. § 77t(d)(1)] ............................................................................19

Section 20(d)(2)
  [15 U.S.C. § 77t(d)(2)] ............................................................................20

Section 20(d)(2)(A)
  [15 U.S.C. § 77t(d)(2)(A)] ...................................................................19, 20

Section 20(d)(2)(B)
  [15 U.S.C. § 77t(d)(2)(B)] ........................................................................20

Section 20(d)(2)(C)
  [15 U.S.C. § 77t(d)(2)(C)] ........................................................................20

**Securities Exchange Act of 1934**

Section 21(d)
  [15 U.S.C. § 78u(d)(1)] ............................................................................18

Section 21(d)(3)(A)
  [15 U.S.C. § 78u(d)(3)(A)] ......................................................................19

Section 21(d)(3)(B)
  [15 U.S.C. § 78u(d)(3)(B)] .................................................................19, 20

Section 21(d)(3)(B)(i)
  [15 U.S.C. § 78u(d)(3)(B)(i)] ..................................................................20

Section 21(d)(3)(B)(ii)
  [15 U.S.C. § 78u(d)(3)(B)(ii)] .............................................................15, 20

Section 21(d)(3)(B)(iii)
  [15 U.S.C. § 78u(d)(3)(B)(iii)] ................................................................20

**Federal Regulations**

Rule 10b-5
  [17 C.F.R. § 240.10b-5(a)-(c)] ..........................................................passim

**Federal Rules of Civil Procedures**

Fed. R. Civ. P. 4(h)(1)(B) ..............................................................................1

Fed. R. Civ. P. 54(c) ....................................................................................10

Fed. R. Civ. P. 55(a) ..................................................................................2, 9

Fed. R. Civ. P. 55(b) .....................................................................................8

Fed. R. Civ. P. 55(b)(2)......................................................................................2

Fed. R. Civ. P. Rule 55(a).................................................................................8

**<u>Local Rules</u>**

Local Rule 55-1.............................................................................................8, 9

## I.    <u>INTRODUCTION</u>

Plaintiff Securities and Exchange Commission ("SEC") hereby moves for entry of default judgment against defendants Spiderworx Media LLC ("Spiderworx") and An L.A. Minute LLC ("ALAM"), whose defaults for failure to respond to the complaint were entered by the clerk on May 10, 2019.  *See* Dkt. No. 24 [Clerk Default].

The SEC filed this action on February 26, 2019.  The complaint alleges that defendants Spiderworx and ALAM, through individual defendants Daniel Adams ("Adams") and Michael Flanders ("Flanders"), made material misrepresentations to two investors in connection with defendants' capital-raise for the production of the 2018 film, "*An L.A. Minute*."  In two securities offerings in 2015 and 2016, Adams— who had pled guilty to criminal fraud and larceny involving another film project several years earlier—and his partner Flanders, duped investors into providing financing for the movie through a series of barefaced falsehoods.  In the first offering, Adams and Flanders lied when they told a prospective investor they had both invested in the film and would not receive any of the funds being raised until bank financing was obtained.  Adams also misrepresented to this individual how investor proceeds had been spent and promised that the $60,000 she invested would be used exclusively to pay attorneys.   Unbeknownst to the investor, Adams and Flanders pocketed a portion of the investor's money for themselves.  In the second offering, after a prospective investor said he would invest $100,000 only if $200,000 was first raised elsewhere, Flanders sent the individual two fabricated emails that Adams had prepared containing a fictitious $200,000 wire transfer confirmation, a doctored email purportedly from an individual who ostensibly provided the $200,000, and a forged signature page from the purported investor, to create the false appearance that the funds had been received.  *See generally*, Dkt. No. 1 [SEC Complaint].

The SEC served Spiderworx and ALAM on April 9, 2019 pursuant to Fed. R. Civ. P. Rule 4(h)(1)(B), via personal delivery upon defendant Adams, their registered

agent. *See* Dkt. Nos. 16-17 [Proofs of Service].  Neither Spiderworx nor ALAM responded to the complaint, and on May 9, 2019, the SEC requested that the court clerk enter defaults against them under Fed. R. Civ. P. 55(a).  *See* Dkt. No. 20 [Request for Entry of Defaults].  The clerk entered the entities' defaults on May 10, 2019.  *See* Dkt. No 24.  On May 13, 2019, the Court *sua sponte* ordered that the SEC's default judgment motion against the two entities be filed on or before May 28, 2019.  *See* Dkt. No. 25.

Accordingly, the SEC now moves under Rule 55(b)(2) for entry of default judgment against Spiderworx and ALAM, permanently enjoining them from future violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] and Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)(2)], and imposing a third tier civil penalty against each entity of $80,000, which equals 50% each of the $160,000 total raised from the two defrauded investors.

## II.   STATEMENT OF FACTS

### A.   Adams and Flanders Co-Found Spiderworx and ALAM

The SEC's complaint alleges that defendants Adams and Flanders met in or about 2014.  *See* Dkt. No. 1 ["Compl."] ¶ 12.  Two years prior, Adams, who is a writer and director, had pled guilty to state tax fraud and larceny, for inflating expenses in the applications for film tax credits on two previous movie projects.  *Id.* ¶ 8.[1]  Flanders is a music producer and songwriter.  *Id.* ¶ 9.

In 2015, Adams and Flanders co-founded defendant Spiderworx (each owning 50%), to raise money to produce at least one movie.  *Id.* ¶ 12.  The first movie they planned to produce was titled "*An L.A. Minute.*"  *Id.*  In October 2016, Adams and Flanders went on to co-found ALAM, to produce and distribute *An L.A. Minute.*  *Id.* ¶

---

[1] In his prior state criminal case, Adams was ordered to pay nearly $4.4 million in restitution to the State of Massachusetts, served twenty-one months in prison, and was sentenced to ten years' probation.  *Id.* ¶ 8.

2

13.  Spiderworx was ALAM's founding and managing member and was initially its 100% owner.  *Id.*

*An L.A. Minute* began filming in November 2016.  *Id.* ¶ 19.  In early December 2016, production shut down due to a lack of funding.  *Id.*  Filming resumed in March 2017, and the movie was released in August 2018.  *Id.* ¶ 20.[2]

## B.   Defendants' Two Securities Offerings

Through Spiderworx and ALAM, Adams and Flanders raised millions of dollars to fund the development and production of *An L.A. Minute*, including at least $1,000,000 raised through two unregistered securities offerings that began in 2015.  *Id.* ¶ 14.[3]  To solicit investors for their securities offerings, both Adams and Flanders communicated with prospective investors in person, by telephone and/or by email, and the two also communicated with each other about how to respond to potential or actual investors' inquiries.  *Id.* ¶¶ 15-16.  Substantially all of the funds Adams and Flanders raised in the securities offerings were deposited into Spiderworx's bank account; Adams and Flanders were signatories on Spiderworx's and ALAM's bank accounts.  *Id.* ¶¶ 17-18.

### 1.   The Spiderworx loan agreements

Defendants' first securities offering took the form of unsecured Spiderworx loan agreements.  *Id.* ¶ 21.  From July 2015 through September 2016, Adams and Flanders raised at least $400,000 from nine investors through these agreements, ostensibly to be used as seed capital until Spiderworx could obtain bank financing for the movie.  *Id.*  Titled "Co-Producer/Development Funding Deal Memo," the Spiderworx loan agreements typically promised a 20% return to be paid when the hoped-for bank financing was obtained, but no later than nine months after execution of the agreements.  *Id.* ¶ 24.  Most of the agreements entitled the investors to a

---

[2] Flanders resigned from Spiderworx in July 2018.  *Id.* ¶ 9.
[3] Spiderworx and ALAM have never registered any securities offerings with the SEC. *Id.* ¶¶ 10-11.

percentage of the profits generated by the film, initially 1% for every $25,000 invested.  *Id.* ¶ 25.

The loan agreements typically included an option permitting the investor to convert his or her contribution into an "equity investment" in the limited liability company that was to produce the film.  *Id.* ¶ 26.[4]  Flanders or Adams signed the agreements on behalf of Spiderworx, and the investors co-signed them.  *Id.* ¶ 27.[5] The investors who invested through Spiderworx loan agreements were passive and did not take an active role in Spiderworx's business; rather, the profits that the investors expected to receive depended upon Adams' and Flanders' managerial acumen.  *Id.* ¶¶ 30-32.

### 2.      The ALAM membership interests

Defendants' second securities offering involved membership interests in ALAM itself.  *Id.* ¶ 33.  Between October and December 2016, Adams and Flanders raised another $600,000 through the sale of ALAM membership interests to four investors.  *Id.*   Three of the ALAM investors were Spiderworx investors.  *Id.* ¶ 34.

Like Spiderworx, ALAM's success was dependent on the managerial efforts of Adams and Flanders.  *Id.* ¶¶ 35, 37.  The four ALAM investors signed ALAM's operating agreement, which explicitly stated that members could take no part in the conduct or control of the business or affairs of the company, and that these responsibilities were vested in the managing member, Spiderworx.  *Id.* ¶ 35. Flanders typically co-signed the agreements on behalf of ALAM.  *Id.* ¶ 36.

### C.      Defendants' Material Misrepresentations and Omissions

Adams and Flanders made multiple material misrepresentations to at least two investors, Angela Maria de Lugo ("de Lugo") and Scot Lewton ("Lewton"), to induce

---

[4] In at least one instance, in an August 31, 2016 email to a potential investor, Adams referred to a Spiderworx loan as an "investment."  *Id.* ¶ 29.

[5] Spiderworx never in fact obtained bank financing for ALAM.  *Id.* ¶ 22.  Ultimately, all nine Spiderworx investors eventually converted their loans into ALAM membership interests.  *Id.* ¶ 28.

their investments in defendants' securities offerings.  *See generally, id.,* ¶¶ 40-83.[6]

*de Lugo.*  The first investor, de Lugo, invested $60,000 through a Spiderworx loan agreement on September 1, 2016.  *Id.* ¶ 41.  De Lugo signed the loan agreement, which was signed by Adams on behalf of Spiderworx.  *Id.*

Flanders had first met de Lugo in or about August 2016, and he introduced de Lugo to Adams by phone.  *Id.* ¶ 43.   Before de Lugo would invest, she requested a list of defendants' other investors, how much each had invested, and a breakdown of how the invested funds raised to date had been spent.  *Id.* ¶ 44.  On August 30, 2016, Flanders assured her via email that he and Adams had personally invested in the film. *Id.* ¶ 45.  Adams also separately emailed de Lugo on or about August 30, 2016, stating that "Mike [Flanders] and I are in for $85K a piece ($170K total)."  *Id.* ¶ 46.

Additionally, on or about August 30, 2016, Adams emailed de Lugo, copying Flanders, stating that Spiderworx had previously raised $322,500, of which "roughly" $140,000 was paid to attorneys, $15,000 was spent on legal overhead, $50,000 was spent on a casting director, $85,000 was spent on line producers, $5,000 was spent on a publicist, $7,500 was spent on office expenses, and $20,000 on travel.  *Id.* ¶ 50.

Adams also told de Lugo orally that the funds she loaned Spiderworx would be used exclusively to pay two different attorneys $30,000 each.  *Id.* ¶ 53.  Adams and Flanders also verbally told de Lugo that neither of them would receive any of the funds being raised from investors until the bank financing was obtained.   *Id.* ¶ 54.

Flanders' and Adams' representations to de Lugo concerning how much they each had invested in the film, how much previous investors had invested and how the prior funding had been spent, and how defendants planned to use de Lugo's funds, were all false and misleading.  As Adams subsequently admitted, he knowingly misrepresented to de Lugo that he and Flanders had each invested $85,000 of their own money in the film.  *Id.* ¶ 48.  Flanders likewise has admitted that he misled de

---

[6] De Lugo and Lewton are referred to respectively as Investor A and Investor B in the SEC's complaint.

Lugo, because he believed she wanted to know if he and Adams had "skin in the game" and thought she would be more inclined to invest if she believed he had placed his own money at risk.  *Id.* ¶ 49.

Adams also subsequently admitted that his email setting forth how prior funds raised had supposedly been spent "was a lie." *Id.* ¶ 51.  Flanders similarly admitted that Adams' representations to de Lugo regarding the uses of investors' funds were "all lies," because most of the money provided by the investors went to Adams and Flanders.  *Id.* ¶ 52.  Adams and Flanders received $21,062 and $18,500, respectively, from de Lugo's investment; only $20,000 was paid to an attorney.  *Id.* ¶ 55.

These misstatements were material.  Whether or not Adams and Flanders had truly invested their own money, how much investor money Spiderworx had raised and how it had been spent, what de Lugo's own funds would be used for, and whether Adams or Flanders would receive any of the funds—each was an important factor to de Lugo's investment decision, as it would be to any reasonable investor.  *Id.* ¶ 57.

**Lewton.**  The second investor, Lewton, purchased an ALAM membership interest for $100,000 in October 2016.  *Id.* ¶ 60.  Lewton, a business associate of Flanders, had made two prior investments in Spiderworx, in 2015 and 2016.  *Id.* ¶ 61.

In or about September 2016, Flanders called Lewton and asked if he could provide $300,000 for the film.  Lewton conditioned the possibility of making an additional investment on defendants' first raising more funds elsewhere, telling Flanders, "if you can get the other two-thirds, then I'll put the other third up."  *Id.* ¶ 63.

On or about September 26, 2016, Flanders sent Lewton an email stating that "we have been very sucessful (sic) and fortunate in raising the other necessary capital . . . [and] now need your 100K portion . . . ."  *Id.* ¶ 64.  The email contained an email from Adams to Flanders earlier that day purporting to reflect a third investor's investment of $200,000 — but, in reality, it was a fabricated email, intended to trick Lewton into believing that the third investor had invested.  *Id.* ¶ 65.  This email chain

from Adams (that Flanders sent Lewton) appeared to forward a wire transfer record showing $200,000 had been deposited into Spiderworx's bank account by the third investor, and an email ostensibly from the third investor to Adams, advising Adams not to spend the $200,000 until the "other $100K" had been raised.  *Id.* ¶¶ 66-67. None of these documents were real.  *Id.*

Less than a minute after sending Lewton this fake email chain, Flanders forwarded Lewton a second email from Adams, attaching an ALAM operating agreement signature page appearing to memorialize the third investor's $200,000 investment.  *Id.* ¶ 68.  It was, however, a forgery.  *Id.* ¶ 69.  Before sending Lewton the fabricated email chain and forged signature page that Adams had sent Flanders, Flanders congratulated his partner on the ruse—telling Adams in a one-word email: "genius."  *Id.* ¶ 70.

In fact, the third investor had not agreed to invest nor invested any money in ALAM at that time, and had not signed any operating agreement.  *Id.* ¶ 74.  Adams subsequently admitted that he fabricated the $200,000 wire transfer record and the email purportedly from the third investor, to induce Lewton to invest.  *Id.* ¶ 71. Adams also admitted that he forged the third investor's signature on the operating agreement.  *Id.* ¶ 72.  At the time Adams falsified these documents, he believed that Flanders would share them with Lewton.  *Id.* ¶ 73.  When Flanders emailed Lewton, Flanders was aware that defendants' fundraising efforts had not been "successful"; that the third investor had not invested; and that the documents purporting to evidence an investment by the third investor were fake.  *Id.* ¶ 76.

On or about October 17, 2016, Flanders deposited Lewton's check into Spiderworx's account; over $10,000 of that investment was transferred to a Spiderworx account doing business as ALAM.  *Id.* ¶¶ 78, 81.  Adams and Flanders personally received $29,000 and $10,000, respectively, from Lewton's investment. *Id.* ¶ 81.  Like defendants' misrepresentations to de Lugo, the misrepresentations to Lewton were material to him, as they would be to any reasonable investor, since his

investment was expressly conditioned on twice as much in additional funding first being raised elsewhere. *Id.* ¶ 80.

Defendants Adams and Flanders acted both with scienter, and with a lack of reasonable care, in making these misrepresentations to their investors. *Id.* ¶¶ 59, 82. As the defaulted entities' co-founders and control persons, their state of mind is imputable to the entities. *Id.* ¶ 83.

## III.   **ARGUMENT**

Fed. R. Civ. P. 55(b) provides for entry of a default judgment by the Court following entry of a default by the court clerk under Rule 55(a). Fed. R. Civ. P. 55(b); *see also Kloepping v. Fireman's Fund*, 1996 U.S. Dist. LEXIS 1786, at *3-4 (N.D. Cal. Feb. 14, 1996). Failure to timely answer a properly-served complaint will justify the entry of a default judgment. *Benny v. Pipes*, 799 F.2d 489, 495 (9th Cir. 1986).[7] Entry of a default judgment is left to the Court's sound discretion. *PepsiCo Inc. v. Triunfo-Mex. Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999), citing *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In *Eitel v. McCool*, the Ninth Circuit explained that a district court should consider the following factors in exercising its discretion:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

---

[7] Local Rule 55-1 requires that an application for default judgment be accompanied by a declaration setting forth: (1) when and against which party default was entered; (2) the identification of the pleading to which the default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented; (4) that the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply; and (5) that notice of the application has been served on the defaulting party, if required by Fed. R. Civ. P. 55(b)(2). The Declaration of Amy Jane Longo, *filed concurrently herewith* ("Longo Decl."), sets forth this information, to the extent it is applicable. *See* Longo Decl. ¶¶ 4-7.

782 F.2d 1470, 1471-72 (9th Cir. 1986).  "In applying this discretionary standard, default judgments are more often granted than denied."  *PepsiCo*, 189 F.R.D. at 432.

Further, a party seeking a default judgment must state a claim upon which it may recover.  *PepsiCo*, *Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1175 (C.D. Cal. 2002).  After default has been entered by the court clerk, all well-pled factual allegations of the complaint are taken as true, except for those relating to damages. *Id.*, citing *TeleVideo Sys.*, *Inc. v. Heidenthal*, 826 F. 2d 915, 917 (9th Cir. 1987); *see also Benny*, 799 F.2d at 496; *Adams v. Agrusa*, No. 2:15-cv-07270 SVW-RAO, 2016 WL 7665767, at *2 (C.D. Cal. July 20, 2016) (granting motion for default judgment). Along with the complaint, the court may look to affidavits and declarations to determine whether default judgment is appropriate.  *See* William W. Schwarzer *et al.*, *California Practice Guide: Federal Civil Procedure Before Trial* § 6:91 (2010).

### A.    The SEC Has Complied With Fed. R. Civ. P. 55(a) and L.R. 55-1

The SEC has satisfied the procedural requirements for a default judgment against Spiderworx and ALAM under Fed. R. Civ. P. 55(a) and Local Rule 55-1.  The SEC has:  (1) served Spiderworx and ALAM with the summons, complaint, notice of assignment, notice to parties of court directed alternative dispute resolution program and the initial standing order of United States District Judge Fernando M. Olguin by personal service (Dkt. Nos. 16-17); (2) caused the clerk to enter defaults against Spiderworx and ALAM for their failure to answer (Dkt. No. 24); (3) demonstrated that Spiderworx and ALAM are neither minors nor incompetent; and (4) demonstrated that Spiderworx and ALAM are not in the military or otherwise exempt under the Soldiers' and Sailors' Civil Relief Act of 1940.  *See* Longo Decl. ¶¶ 4-7.

Notice to Spiderworx and ALAM of this motion and the relief requested are not required under Fed. R. Civ. P. Rule 55(b)(2) and L.R. 55-1, because they have not appeared in this action in any capacity; however, the SEC has nevertheless provided notice of this motion to Spiderworx and ALAM.  *Id.* ¶¶ 8-10.  Additionally, because

the SEC does not request relief that differs from or exceeds that prayed for in the complaint, the application for default judgment complies with Fed. R. Civ. P. 54(c).[8]

### B.   The *Eitel* Factors Support Entry of Default Judgment

#### 1.   Possibility of prejudice to the SEC

The possibility of prejudice exists where "[i]f Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery." *PepsiCo*, 238 F. Supp. 2d at 1177; *see also Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F. Supp. 916, 920 (C.D. Cal. 2010) (granting default judgment, where "[d]enying default judgment here would leave [plaintiff] without a proper remedy."); *Penpower Technology Ltd. v. S.P.C. Technology*, 627 F.Supp.2d 108, 1088-89 (C.D. Cal. 2008) (granting permanent injunction by default judgment, noting that "[a]ccepting the allegations in the Complaint as true, Plaintiffs would be prejudiced absent entry of default judgment").

Here, the SEC seeks to enforce its regulatory antifraud remedies against Spiderworx and ALAM, through a permanent injunction and civil monetary penalties. Absent a default judgment, the SEC would be without other recourse for relief unless it incurs substantial time and expense to proceed by a motion for summary judgment or by trial.  The possibility of prejudice is enhanced by the fact that Spiderworx and ALAM have defaulted, thereby admitting the averments of the complaint.  *See, e.g., SEC v. Wallace*, Case No. SACV 16-01788 AG (FFMx), 2017 WL 8230026, at *3 (C. D. Cal. May 8, 2017) ("The SEC's duty to enforce federal securities laws would be undermined if the Court were to allow Wallace, who is aware of this lawsuit, to escape liability simply by not responding to the case"); *SEC v. Newman*, CV 12-03142-BRO (PLAx), 2016 193639 (C.D. Cal. July 15, 2016) ("given that Defendant has 'elected not to take part in the litigation, the Commission will be unable to fulfill its mandate to protect the investing public in the absence of a default judgment.'")

---

[8] Fed. R. Civ. P. Rule 54(c) provides in relevant part that, "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

1  (quoting *SEC v. Lion Capital Mgmt., LLC*, No. C 12-05116 WHA, 2013 U.S. Dist.

2  LEXIS 157133, *7 (N.D. Cal. Nov. 1, 2013)); *SEC v. Pedras*, No. CV 13–7932 GAF

3  (MRWx), 2014 WL 12597332, at *4 (C.D. Cal. Apr. 16, 2014) ("If default judgment

4  were not entered, Plaintiff would have no way to enforce the Securities Act or the

5  Exchange Act against Defaulting Defendants.").

6                    **2.    Substantive merits and sufficiency of the complaint**

7          Taken together, the second and third *Eitel* factors "require that a plaintiff state

8  a claim on which [plaintiff] may recover." *PepsiCo*, 238 F. Supp. 2d at 1175

9  (citation omitted).  Well-pleaded allegations are taken as admitted on a default

10  judgment. *Benny*, 799 F.2d at 495.  Here, the SEC's well-pled allegations establish

11  that Spiderworx and ALAM violated Section 10(b) of the Exchange Act/Rule 10b-

12  5(b) thereunder, and Section 17(a)(2) of the Securities Act.

13          To state a claim based on material misstatements or omissions under Section

14  10(b)/Rule 10b-5(b), the SEC must allege: (1) that the defendant made a material

15  misstatement or omission; (2) in connection with the purchase or sale of a security in

16  interstate commerce; and (3) scienter.  *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir.

17  2007).  To state a claim for material misstatements under Section 17(a)(2), the SEC

18  must allege:  (1) that the defendant obtained money or property; (2) by means of a

19  material misstatement or omission in the offer or sale of a security in interstate

20  commerce; and (3) at least negligence.[9]

21          ***Material misstatements.***  Section 10(b) and Rule 10b-5 prohibit the "making"

22  of material misrepresentations or omissions.  *See Lorenzo v. SEC*, 139 S.Ct. 1094,

23  ─────────────────────

24  [9] Telephones, email and the internet are instrumentalities of interstate commerce.
*See, e.g., United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) ("Telephones are
25  instrumentalities of interstate commerce ..."); *Utah Lighthouse Ministry v.
Foundation for Apologetic Info. & Research*, 527 F.3d 1045, 1054 (10th Cir. 2008)
26  ("We agree that the Internet is generally an instrumentality of interstate commerce.");
*see also Lopes v. Vieira*, 543 F. Supp. 2d 1149, 1174-75 (E.D. Cal. 2008) (use of
27  means of interstate commerce and face-to-face meetings sufficient to allege
jurisdiction).  The SEC's complaint alleges that defendants' interactions with
28  investors occurred through email and by telephone.  *See, e.g.*, Compl. ¶¶ 15-16, 45-
46, 62-63.

1098 (2019), citing *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S.
135 (2011) (primary liability under Section 10(b) exists for parties that "make"
material misstatements or omissions).  The omissions or misstatements must concern
material facts, which is established if there is a substantial likelihood that a
reasonable investor would consider the fact important in making an investment
decision.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S. Ct. 2126, 48 L.
Ed. 2d 757 (1976).  Liability arises not only from affirmative representations but also
from failures to disclose material information.  *See Dain Rauscher*, 254 F.3d at 855-
56.  The antifraud provisions impose "a duty to disclose material facts that are
necessary to make disclosed statements, whether mandatory or volunteered, not
misleading."  *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996).

   As the SEC's complaint alleges, for purposes of *Janus*, defendants Adams and
Flanders made the misrepresentations to investors de Lugo and Lewton.  Compl. ¶¶
56, 79.  Because Adams and Flanders were the co-founders and co-owners of
Spiderworx, which was the managing member of ALAM, their conduct is imputed to
the entities.  *See, e.g. Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1433-36
(9th Cir. 1995) (describing various theories of imputed corporate liability for acts and
scienter of officers and directors); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787
F.3d 408, 426-27 (7th Cir. 2015) (finding no prejudice in pre-*Janus* jury instruction
indicating that corporation was liable for misstatements made by its agents, noting
that "Nothing in *Janus* undid the long-standing rule that "[a] corporation is liable for
statements by employees who have apparent authority to make them").[10]

   These misrepresentations were plainly material.  Any reasonable investor

---

[10] Unlike liability under Section 10(b), *Janus* has no bearing on claims brought under
Section 17(a) of the Securities Act.  The "vast majority of courts dealing with the
question of whether *Janus* also applies to claims under Section 17 have answered that
question with a resounding 'no.'"  *SEC v. Benger*, 931 F. Supp. 2d 904, 906 (N.D. Ill.
2013) (citing cases); *SEC v. Sells*, No. C 11-4941 CW, 2012 WL 3242551, at *7
(N.D. Cal. Aug. 10, 2012); *SEC v. Mercury Interactive, LLC*, No. 5:07-CV-02822-
WHA, 2011 WL 5871020, at *3 (N.D. Cal. Nov. 22, 2011); *SEC v. Daifotis*, No. C
11-00137 WHA, 2011 WL 3295139, at *5 (N.D. Cal. Aug. 1, 2011).

would have considered it important to their investment decision to know that funds they believed had been raised from other investors or committed by the entities' principals were nonexistent; that the uses of prior funds raised were a fiction; and that their own funds would not be used as described, but rather would go, at least in part, straight into the defendants' own pockets. *E.g.,* Compl. ¶¶ 57, 82.

*In the offer or sale of, and in connection with the purchase or sale of, securities.* Section 17(a) prohibits fraud in the offer and sale of securities (*see* 15 U.S.C. § 77q(a)), while Section 10(b) and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Defendants' misrepresentations occurred in connection with the purchase or sale of, and in the offer or sale of, securities—namely, the Spiderworx offering (in the case of de Lugo), and the ALAM offering (in the case of Lewton). Both investment programs were securities offerings under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). There, the Supreme Court defined an investment contract to require: (1) the investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived from the promoters' managerial efforts. *See SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003); *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130 (9th Cir. 1991). Each of these elements are present in defendants' offerings: both involved the raising of money from investors, for the common cause of financing *An L.A. Minute*, the success of which depended on the efforts of the defendants, its promoters. *See generally* Compl. ¶¶ 21-39.

Defendants' conduct was also clearly "in the offer or sale," and "in connection with the purchase or sale," of securities in interstate commerce. The phrase "in connection with the purchase or sale" of a security is met when the fraud alleged "coincides with a securities transaction," while the term "in the offer or sale of" requires only that there be "deceptive practices touching" the purchase or sale of securities. *See Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit*, 547 U.S. 71, 85 (2006); *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13

(1971); *SEC v. Zandford*, 535 U.S. 813, 819 (2002); *see also United States v. Naftalin*, 441 U.S. 768, 777-78 (1979) (the phrase "in the offer or sale of securities" in Section 17(a) is "broad enough to cover the entire selling process."). Here, defendants' misrepresentations occurred during their offer and sale of these two securities offerings to the two investors at issue.

   ***Scienter and negligence***.  Violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder require proof of scienter, while violations of Securities Act Section 17(a)(2) merely require a showing of negligence.  *See Dain Rauscher*, 254 F.3d at 856; *Aaron v. SEC*, 446 U.S. 680, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980).  In the Ninth Circuit, scienter may be established by a showing of either "deliberate recklessness" or "conscious recklessness."  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d at 1093; *SEC v. Dain Rauscher*, 254 F.3d at 856.   Reckless conduct "consists of a highly unreasonable act, or omission, that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Id*.  Negligence, by contrast, is the absence of "reasonable prudence."  *Dain Rauscher, Inc.*, 254 F.3d at 856-57; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).  Since a corporation acts through its officers, the culpability of an entity's principals is imputed to the corporation.  *See, e.g., SEC v. Platforms Wireless Int'l. Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008), *aff'd.*, 617 F.3d 1072 (9th Cir. 2010), citing *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

   Here, the complaint alleges that Adams and Flanders, the co-founders of Spiderworx and ALAM, and co-owners of Spiderworx, ALAM's managing member, carried out the misrepresentations with scienter—and even admitted *post hoc* the falsity of certain of their misrepresentations.  Compl. ¶¶ 48-49, 51-52, 71-73.  Both defendants have admitted lying to de Lugo concerning the amount of their own

14

money invested in the film.  *Id.*  One of the defendants, Adams, has acknowledged forging documents, fabricating a wire transfer record, and falsifying email correspondence.  *Id.*  Given the egregiousness of the misrepresentations to de Lugo and Lewton—carried out by at least one defendant with a record of prior criminal misconduct in raising funds for film projects—the scienter that is imputable to the defaulted entities is beyond serious dispute.

Because the uncontested allegations of the SEC's complaint establish well-pled and sufficient claims for violations of Section 10(b)/Rule 10b-5(b) and Section 17(a)(2) by Spiderworx and ALAM, these two factors favor entry of default judgment.

### 3.   Amount at stake and seriousness of Spiderworx's and ALAM's conduct

Turning to the fourth *Eitel* factor, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct."  *PepsiCo*, 238 F. Supp. 2d at 1176.  There is no question that the conduct of Adams and Flanders, as imputed to Spiderworx and ALAM, involved serious violations of the federal securities laws, resulting in substantial harm to two investors.  By virtue of their material misstatements, defendants defrauded investors out of $160,000.  Compl. ¶¶ 41, 60.  The SEC seeks civil money penalties of $80,000 each from Spiderworx and ALAM, which together equals the $160,000 pecuniary gain raised from the two investors.  *See*, *e.g.*, 15 U.S.C. § 78u(d)(3)(B)(iii).  These amounts are commensurate with the seriousness of their misconduct.  This *Eitel* factor is therefore neutral.

### 4.   Possibility of disputed facts

The fifth *Eitel* factor considers the possibility of a dispute as to any material facts in the case.  Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d at 917-18 (citations and quotations omitted).  As explained above, the allegations in the SEC's complaint establish that Spiderworx and ALAM violated the

federal securities laws, and if litigated, those allegations would be supported by substantial evidence.  These entities, who are not represented by counsel and have not appeared in the action nor responded in any way to the SEC's claims against them, have not and will be unable to refute this evidence.  *See, e.g., SEC v. Baccam*, No. ED CV 17-0172 SJO (SPx), 2017 WL 5952168, at *7 (C.D. Cal. June 14, 2017) (granting default judgment, where "the SEC filed a well-pleaded Complaint alleging facts sufficient to prevail on its claims" and the complaint and default motion were "unopposed.").  Thus, there are no disputed facts, and this *Eitel* factor favors granting default judgment.

### 5. Possibility of excusable neglect

The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect.  Due process requires that all interested parties be given notice reasonably calculated to apprise them of the pendency of the action and be afforded an opportunity to present their objections before a final judgment is rendered.  *Mullane v. Central Hanover Trust Co*., 339 U.S. 306, 314 (1950).  "The possibility of excusable neglect is remote where the defendant is provided proper notice of the pending suit, but does not contact the court or the plaintiff in any manner." *Baccam*, 2017 WL 5952168, at *8, citing *Phillip Morris USA, Inc. v. Castworld Prods., Inc*., 219 F.R.D. 494, 501 (C.D. Cal. 2003).  In the instant case, the SEC served the entities through personal service on their registered agent, defendant Adams.  Longo Decl. ¶ 4; Dkt. Nos. 16-17.

Because the entities are not represented by counsel, they are not able to appear in the action under L.R. 83-2.2.2.  While Adams and Flanders have both answered the complaint, the entities have failed to answer, nor have they moved to set aside the default entered by the clerk since it was entered.   Adams has confirmed by email to counsel for the SEC that the entities will not be represented.  Longo Decl. ¶ 13, Ex. 9 [email from Adams].  That the entities are unrepresented by counsel and have defaulted was further stated in the Joint Rule 26(f) Report that was signed by defendants Adams and Flanders on May 21, 2019.  Dkt. No. 28 at 5.  The notice the

1    entities have received regarding this action, combined with their inaction since the

2    action was filed on February 26, 2019, preclude them from showing any possibility of

3    excusable neglect.  Therefore, the sixth *Eitel* factor favors granting a default judgment.

4             **6.     Policy for deciding on the merits**

5        The mere existence of Fed. R. Civ. P. 55(b) suggests that the seventh *Eitel*

6    factor, a preference for deciding matters on their merits, is not alone dispositive.

7    *PepsiCo*, 238 F. Supp. 2d at 1177.  Indeed, the "Defendant's failure to answer [the]

8    Complaint makes a decision on the merits impractical, if not impossible."  *Id*.; *accord*

9    *Board of Trustees of California Ironworkers Field Pension Trust v. South Bay Iron,*

10   *Inc*, Case No. CV 17-9141 FMO (ASx), 2018 WL 5928156, at \*5 (C.D. Cal. July 25,

11   2018) (granting default judgment); *U.S. v. Barrera*, Case No. CV 14–5436 FMO

12   (Ex), 2014 WL 12691621, at \*2 (C.D. Cal. Dec. 26, 32014) (same).  Therefore, the

13   seventh *Eitel* factor should not preclude the Court from entering a default judgment

14   against Spiderworx and ALAM.

15       **C.     The SEC Is Entitled to the Relief it Seeks**

16        In its complaint, the SEC sought a judgment: (1) permanently enjoining

17   Spiderworx and ALAM from future violations of Exchange Act Section 10(b) and

18   Rule 10b-5(b) thereunder and of Securities Act Section 17(a)(2); and (2) imposing

19   civil monetary penalties under Section 20(d) of the Securities Act and Section

20   21(d)(3) of the Exchange Act.  Because the SEC has shown that default judgment

21   against Spiderworx and ALAM is warranted, the Court should order the relief

22   requested.

23           **1.     Spiderworx and ALAM should be permanently enjoined**

24        Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of

25   the Exchange Act, 15 U.S.C. § 78u(d)(1), provide that upon proper showing, a

26   permanent injunction shall be granted in an enforcement action brought by the SEC.

27   To obtain an injunction, the SEC must establish that there is a reasonable likelihood

28   of future violations.  *See SEC v. Murphy*, 626 F.2d at 655.  Whether a likelihood of

1   future violations exists depends upon the totality of the circumstances.  *Id*.  The

2   existence of past violations may give rise to an inference that there will be future

3   violations.  *See id*.; *see also United States v. Odessa Union Warehouse Coop*., 833

4   F.2d 172, 176 (9th Cir. 1987) (citing *SEC v. Koracorp Industries, Inc*., 575 F.2d 692,

5   698 (9th Cir. 1978)).  Courts also consider factors such as the degree of scienter

6   involved, the isolated or recurrent nature of the infraction, the defendant's recognition

7   of the wrongful nature of the conduct, the likelihood, because of the defendant's

8   professional occupation, that future violations may occur, and the sincerity of the

9   defendant's assurances against future violations.  *See Murphy*, 626 F.2d at 655;

10  *Koracorp*, 575 F.2d at 698.

11       A reasonable likelihood exists that, absent a permanent injunction, Spiderworx

12  and ALAM may commit future securities violations.  The SEC's complaint—the

13  allegations of which are taken as true for purposes of this motion—reflect a blatant

14  fraud committed against the two ALAM investors, undertaken with a high degree of

15  scienter.  That Adams and Flanders acted knowingly to deceive de Lugo and Lewton

16  is uncontested, as each have admitted misrepresenting material facts to these two

17  investors under oath.  Compl. ¶¶ 48-49, 51-52, 71-73.  Both have admitted lying to de

18  Lugo about the amount of money they had each invested in the film.  *Id*.  Adams has

19  further admitted forging an investor's signature on an ALAM operating agreement,

20  fabricating a wire transfer record purportedly evidencing that investor's deposit, and

21  sending Lewton a fake email to induce his investment.  *Id*.  For his part, Flanders

22  described Adams' correspondence with Lewton as an act of "genius."  *Id*. ¶ 70.

23  Further, Adams is a recidivist, with a past criminal record in the movie financing

24  industry.  *Id*. ¶ 8.

25       By failing to file an answer or otherwise participate in this action, Spiderworx

26  and ALAM have declined to offer this Court any assurances that they will not commit

27  violations of the federal securities laws.  Nor have they acknowledged the wrongful

28  nature of their conduct.  *See, e.g., Baccam*, 2017 WL 5952168, at *9 (awarding

injunctive relief by default, noting that the defendant "has not given any assurances against future violations, but to the contrary, declined to appear in this case"). Accordingly, this Court should issue a judgment permanently enjoining Spiderworx and ALAM from future violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder and Securities Act Section 17(a).

### 2.    Spiderworx and ALAM should pay third-tier civil penalties

Spiderworx and ALAM violated the Securities Act and the Exchange Act, and so are liable for penalties under Section 20(d)(1) and Section 21(d)(3)(A) of those acts, respectively.  *See* 15 U.S.C. §§ 77t(d)(1), 78u(d)(3)(A).  Civil penalties are meant to punish wrongdoers and to deter them and others from future securities law violations.  *See Kenton Capital*, 69 F. Supp. 2d at 17.  Under Section 20(d)(2)(A) of the Securities Act and Section 21(d)(3)(B) of the Exchange Act, the amount of any civil penalty "shall be determined by the court in light of the facts and circumstances."  15 U.S.C. §§ 77t(d)(2)(A), 78u(d)(3)(B).  Because civil penalties, like permanent injunctions, are imposed to deter the wrongdoer from similar conduct in the future, in assessing civil penalties, courts frequently apply the factors set forth in *SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980), used to establish the need for injunctive relief.  *See*, *e.g.*, *SEC v. Abacus Int'l Holding Corp.*, 2001 U.S. Dist. LEXIS 12635, at *15 (N.D. Cal. Aug. 16, 2001).  Those factors include:  (i) the degree of scienter involved; (ii) the isolated or recurrent nature of the infraction; (iii) the defendant's recognition of the wrongful nature of the conduct; (iv) the likelihood, because of the defendant's professional occupation, that future violations might occur; and (v) the sincerity of any assurances against future violations.  *See Murphy*, 626 F.2d at 655; *see also CMKM Diamonds*, 635 F. Supp. 2d at 1192.

The Securities Act and the Exchange Act provide that penalties should be assessed according to a three-tier system.  *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). First-tier penalties may be imposed for any violation of either Act.  *See id*. §§ 77t(d)(2)(A), 78u(d)(3)(B)(i).  Second-tier penalties apply to violations that "involved

fraud, deceit, manipulation or deliberate or reckless disregard of a regulatory requirement." *Id*. §§ 77t(d)(2)(B), 78u(d)(3)(B)(ii).  Third-tier penalties apply to violations that (i) involve "fraud, deceit, manipulation, or reckless disregard of a regulatory requirement" and (ii) "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii).  Each tier provides that a penalty cannot exceed the greater of either a specific statutory amount, or "the gross amount of pecuniary gain to such defendant as the result of the violation." *Id*. §§ 77t(d)(2), 78u(d)(3)(B); *see, e.g., SEC v. mUrgent Corp.*, Fed. Sec. L. Rep. P 96, 746, 2012 WL 630219, at **2-3 (C.D. Cal. Feb. 28, 2012) (awarding penalties in amounts tied to total funds raised by boiler room offering).

Here, the *Murphy* factors support a third-tier civil monetary penalty based on pecuniary gain.  The SEC has submitted ample evidence of the amounts raised by defendants from de Lugo and Lewton, including defendants' and the investors' testimony on this point.  Longo Decl. ¶¶ 11, Exs. 1-4 [investigative testimony excerpts].  According to the documents evidencing these investments, the total investor proceeds that Spiderworx and ALAM raised from the investors they defrauded was $160,000.  *Id.* ¶ 12; Exs. 5-8 [checks and agreements memorializing de Lugo and Lewton investments].  Allocating one-half of the pecuniary gain to each entity, each defaulted defendant would face a penalty of $80,000.  Adams and Flanders acted with a high degree of scienter, which is imputable to the defaulted entities.  Adams and Flanders have admitted deceiving investor de Lugo as to the amounts of money they invested, while Adams has admitted lying to her about the amounts previously raised from others, and the uses of those funds.  Compl. ¶¶ 45-52. Adams has further admitted sending Lewton forged and fictitious documents in order to procure his investment.  *Id.* ¶¶ 71-72, 75.  Both personally received funds from these investors.  *Id.* ¶¶ 54-55, 81.  These violations created not only a significant risk of loss but substantial losses to the two investors.

Furthermore, since they have defaulted, Spiderworx and ALAM have provided no evidence of any inability to pay such an award—nor any evidence of their financial condition whatsoever—further warranting the recommended penalty. *See, e.g., Baccam*, 2017 WL 5952168, at *11 (awarding civil penalty on default judgment motion, finding that "the imposition of a third-tier penalty is appropriate 'to adequately serve the deterrent function of the civil penalty provision;'" citations omitted), *SEC v. Souza*, 2011 WL 2181365, at *3 (E.D. Cal. June 3, 2011) (imposing gross amount of pecuniary gain on default judgment motion, "in order to adequately serve the deterrent function of the civil penalty provision").

### D.   Default Judgment Against Spiderworx and ALAM Should be Entered Without Delay

Fed. R. Civ. P. Rule 54(b) provides that "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Thus, where delay is necessary to avoid an inconsistent result as to similarly situated defendants, Fed. R. Civ. P. Rule 54(b) requires deferring the entry of default judgment. *See First T.D. & Investment, Inc.*, 253 F.3d 520, 532 (9th Cir. 2001) (reversing entry of default judgments on a legal theory that was rejected by the court as to answering defendants in the same action), citing *Frow v. De La Vega*, 82 U.S. 552 (1872). However, provided that "uniformity of liability is not logically required by the facts and theories of the case, the risk of inconsistent judgments is not sufficiently extreme to bar entry of default judgment as a matter of law." *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1008-09 (N.D. Cal 2001) (entering default judgment against defaulting defendants, notwithstanding that one defendant answered, finding that because his liability "turns on the facts proven with respect to his own conduct and involvement…differing judgments would not necessarily be illogical…").

Because the entities have failed to answer the SEC's complaint, and cannot,

21

without counsel, appear and defend this enforcement action, the Court should enter final judgment against the entities at this time, notwithstanding that defendants Adams and Flanders have answered the complaint.  *See, e.g., Constr. Laborers Trust Funds for S. Cal. Admin. Co. v. Black Diamond Contr. Grp., Inc.*, No. SACV 17-770-JLS, 2017 WL 6496434 (C.D. Cal. Dec. 18, 2017) (awarding monetary relief against defaulting defendant, noting that "plaintiff would be prejudiced absent entry of judgment…in the delay of collection of funds"); *SEC v. CFO-5*, No. 08-cv-01594-PAB-MEH, 2010 WL 1790414, at *5 (D. Colo. May 4, 2010) (entering default judgments of injunctive relief, and disgorgement, finding no reason for delay under Rule 54(b)).  Entry of final judgment against the defaulted entity defendants and an award of injunctive relief and civil monetary penalties for their uncontested conduct in violation of the federal securities laws are therefore appropriate.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, plaintiff SEC respectfully requests that the Court grant its motion for entry of default judgment in its entirety, and impose the requested relief.

Dated:  May 28, 2019

Respectfully submitted,

*/s/ Amy Jane Longo*
Amy Jane Longo
William S. Fiske
Attorneys for Plaintiff
Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION,
444 S. Flower Street, Suite 900, Los Angeles, California 90071
Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On May 28, 2019, I caused to be served the document entitled **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS SPIDERWORX MEDIA LLC AND AN L.A. MINUTE** on all the parties to this action addressed as stated on the attached service list:

☒    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **FEDERAL EXPRESS:**  By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Fedex or delivered to a Fedex courier, at Los Angeles, California.

☒    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  May 28, 2019

*/s/ Amy Jane Longo*
Amy Jane Longo

1

*SEC v. Daniel Adams, etc. et al*
**United States District Court—Central District of California**
**Case No.** 2:19-cv-01412-FMO-RAO

**<u>SERVICE LIST</u>**

Michael A. Flanders **(served by ECF and mail)**
501 Sandy Cove
Old Hickory, TN 37138-2571
***Pro Se Defendant***

Daniel R. Adams **(served by ECF and mail)**
550 S. Barrington Ave., Apt 4115
Los Angeles, CA 90049
***Pro Se Defendant***

An L.A. Minute, LLC
Registered Agent of Service Daniel R. Adams **(served by mail)**
550 S. Barrington Ave., Apt 4115
Los Angeles, CA 90049

Spiderworx Media, LLC
Registered Agent of Service Daniel R. Adams **(served by mail)**
550 S. Barrington Ave., Apt 4115
Los Angeles, CA 90049